GRANVILLE SEVIER *v.* PATRICK GLEASON, COR-
ONER OF THE CITY AND COUNTY OF HONO-
LULU.

No. 1986.

ARGUED APRIL 8, 1932.                    DECIDED APRIL 25, 1932.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.

This is a suit for an injunction, brought by Colonel Granville Sevier, an officer in the United States Army, to restrain the coroner of the City and County of Honolulu from executing his expressed determination to order an autopsy to be performed on the body of the petitioner's deceased wife. It was stipulated between the parties that the coroner's intention to order the autopsy would be held in suspense pending a final determination of the case and therefore no restraining order was issued. After a full investigation and the taking of much testimony the

circuit judge denied the injunction and the matter is here on appeal.

Mrs. Sevier died in Honolulu, at Tripler General Hospital, on the 27th day of August, 1928, and her remains were on the following day placed in a vault in Nuuanu Cemetery, Honolulu, where they now lie. The law under which the coroner claims the right to act is contained in section 3941, R. L. 1925, the pertinent paragraphs of which are as follows: "As soon as any coroner shall have notice of the death of any person within his jurisdiction, supposed to have come to death by poisoning, violence, or in any suspicious manner, he shall forthwith issue his summons to six good and lawful men of the district where the death may have occurred, or in which the dead body may have been found or is at the time lying, to appear before him at the time and place expressed in the warrant, and there to inquire upon the view of the body of the deceased, when, how, and by what means he came to his death. In all cases of sudden death the coroner shall inquire into the cause, and in his discretion may cause an inquest to be held even if he is not satisfied that there are suspicious circumstances attending the death."

We find no substantial evidence in the record that Mrs. Sevier came to her death suddenly, as that term is used in the statute. It is apparent from the evidence that she had long prior to her death been in ill health, developing at intervals symptoms of increasing gravity which necessitated hospitalization and medical treatment. On July 4, 1928, she was finally placed in Tripler General Hospital where she was constantly under medical observation and treatment, and where she eventually died on August 27, 1928. There is no evidence that the end came unexpectedly and without warning. On the contrary, it is shown by at least one of her physicians that he antici-

pated that her demise would come much earlier than it did. Under these circumstances it can hardly be said that Mrs. Sevier's death was so unheralded and unexpected as to be classified as sudden. The coroner must therefore look to the preceding clause of the statute for his authority to hold the contemplated autopsy. That is to say, in order to justify an autopsy it must reasonably appear from all the evidence that Mrs. Sevier came to her death "by poisoning, violence, or in any suspicious manner." There is no suggestion that she came to her death by violence nor is there any suggestion of any suspicion other than that poison was the proximate cause of her death. It is not necessary that the coroner himself should have formed the belief or the suspicion that Mrs. Sevier died from poisoning. He need only have reached the conclusion in the light of all the circumstances and the information submitted to him that a reasonable man might form such a suspicion.

In *Coty* v. *Baughman*, 210 N. W. (S. D.) 348, 349, the court said: "Appellant contends he had a right to perform his autopsy by virtue of his office of coroner regardless of the consent or objection of the parents. The statute provides the coroner is authorized to hold an inquest 'upon the dead bodies of such persons only as are supposed to have died by unlawful means.' Section 10179, R. C. 1919. It will be noticed that the right of the coroner to hold an inquest is limited to such persons only as are supposed to have died by unlawful means. The phrase, 'supposed to have died by unlawful means,' does not give to the coroner an unlimited, captious, or arbitrary power to hold inquests. 'The duty of a coroner to hold an inquest rests on sound reason, on that reason which is the life of the law. It is not a power to be exercised capriciously and arbitrarily against all reason.' County of Lancaster v. Mishler, 100 Pa. 624, 45 Am. Rep.

402; section 3871, and section 3874, subd. 2, R. C. 1919."

In the case of *County of Lancaster* v. *Mishler,* 100 Pa. St. 624, 627, it was said: "The duty of a coroner to hold an inquest rests on sound reason, on that reason which is the life of the law. It is not a power to be exercised capriciously and arbitrarily against all reason. The object of an inquest is to seek information, and obtain and secure evidence, in case of death by violence or other undue means. If there be reasonable ground to suspect it was so caused, it becomes the duty of the coroner to act. If he has no ground for suspecting that the death was not a natural one, it is a perversion of the whole spirit of the law to compel the county to pay him for such services. In this case the inquest found the decedent came to his death 'from a paralytic stroke.' Nay, more, if under the facts offered in evidence a coroner may hold an inquest, he may in his discretion at the expense of the county order a post mortem examination, whereby those bound to the deceased by the nearest and most tender ties may have their feeling lacerated, in every case of natural death. The idea is preposterous and abhorrent to all finer emotions of human nature."

The restraint laid by the law upon the discretionary power of a coroner to hold an inquest and subject a lifeless body to an autopsy, involving as it often does exposure of the corpse to public gaze and its partial dismemberment, is based on the horror which all civilized people have of dragging from their hallowed resting place those upon whom death has laid its inexorable hand. It is also based upon the deep respect which society has for the tender feelings of those bereaved ones to whom the departed was attached in life, and whose grief would be rendered more poignant by the dissection and profane manipulations that are incidental to an adequate autopsy. These sentiments are too greatly revered to be disregarded

unless it is reasonably apparent that it is necessary to the detection of crime. The law, which is a great human institution and not merely an inflexible dogma, does not permit the capricious and ruthless violation of such sacred emotions. These emotions, however, must yield to the stern requirements of the law that all reasonable means be taken for the detection of crime.

On September 18, 1928, Captain W. C. Whitmore, a medical officer in the United States Army, filed in the bureau of vital statistics at Honolulu a standard certificate of the death of Marion D. Sevier. This certificate shows that the deceased came to her death August 27, 1928, at the Tripler General Hospital, Honolulu, and that the cause of her death was "Cardiac, dilatation, acute (duration) Undetermined Contributory 1. Arteriosclerosis, generalized (Secondary) 2. Nephritis, (a) (duration) Undetermined." There is nothing in the certificate to indicate that Mrs. Sevier died from any other than natural causes. Ample authority for its admission in evidence is contained in section 1222, R. L. 1925, which reads as follows: "The registrar general shall furnish to any person applying for the same, a certified copy of the record of any birth, death and marriage contained in any of the records kept under or by virtue of this chapter; such certified copy shall be competent evidence in any court of the fact therein contained, for which certified copy the sum of one dollar shall be charged and paid and accounted for to the treasury." The truth of the certificate was never openly questioned until April, 1929, almost eight months after Mrs. Sevier's death. On the 15th of that month an autopsy was performed at the naval hospital at Pearl Harbor. It had no connection with an official inquest but was privately conducted, with the consent of Colonel Sevier, and apparently at the request of one Ralph L. Shainwald, Jr.,

a brother of the deceased. Those present and participating in the autopsy were Doctors Nils P. Larsen, Alexander O. Gettler, George F. Straub, A. E. Fennell and a number of army and navy doctors whose names do not appear in the record. With the exception of Dr. Gettler, who is a toxicologist of wide influence and conceded ability, the others present were all medical doctors of high repute. Doctors Larsen and Gettler represented Shainwald and Doctors Straub and Fennell represented Colonel Sevier.

It appears from the evidence that at the time of Mrs. Sevier's interment the viscera had been removed from her body and in some manner disposed of. It was thus impossible to conduct as complete an examination as is desirable in a case in which poisoning is imputed. However, such portions of the body as were available were minutely scrutinized by those present and five sets of specimens were removed for the purposes of chemical analysis and further study. One of these was taken by Shainwald's representatives, one set by Colonel Sevier's representatives and three sets by the army and navy physicians.

The results of these analyses and studies are summed up in the findings contained in the reports subsequently submitted by Doctors Gettler and Fennell, which were received in evidence. Dr. Gettler, the toxicologist, pursued his inquiry on the basis of a search for evidence of six types or categories of poison—volatile, metallic, glucoside, saponin, alkaloidal and a miscellaneous group of poisons. His report showed that his analysis of the tissues taken from Mrs. Sevier's body revealed a complete absence of all of the above poisons with the exception of those contained in the alkaloidal group. With reference to the latter Dr. Gettler reserved the privilege of continuing his experiments in his New York laboratories where better facilities were available because of certain

reactions obtained. In the course of the trial Mr. Sanford B. D. Wood testified that he interviewed Dr. Gettler in New York and that the latter advised him that his examination had revealed no evidence whatever of alkaloidal poisoning. Dr. Fennell's report contains the unequivocal declaration that Mrs. Sevier did not die from chronic mercurial poisoning, which according to other testimony is the only type of poison calculated to produce conditions similar to those observed in the body of Mrs. Sevier during the autopsy. He based his conclusion upon "the history of the case * * * coupled with the gross findings at the autopsy, * * * the results of the chemical examination of eight pieces of tissue" and "the histological examination of thirteen pieces of tissue." Dr. Straub testified that he concurred fully in Dr. Fennell's findings. No reports of the army and navy medical officers who were present at the autopsy were received in evidence. Neither were they called as witnesses. One jar of specimens was forwarded to the United States Hygienic Laboratory, Washington, D. C., for histological examination. The report of Major George R. Callender, an officer in the medical corps of the United States Army, who conducted the examination, concludes as follows: "The request for the examination stated that it was for the purpose of determining whether or not there were evidences of poisoning with particular reference to mercury. The pathological changes in the tissues received present no evidence for or against a poisoning with mercurials or any other substance. In other words a poisoning might have been present and the tissues show no different changes than were shown. On the other hand there is no evidence whatsoever of the existence of such poisoning. The internal organs which were not available for examination are the ones which would show changes due to such poisoning although here again there

is little evidence in the literature to indicate what changes would be found in chronic poisoning or as the result of poisoning occurring some time before the death of the individual." Dr. Nils P. Larsen, who represented Shainwald at the autopsy, made no written report of his findings but was called as a witness at the trial by the defendant. His pertinent testimony is as follows: "Q What were your findings, Doctor, as a result of your examination of the body and your analysis of it? A The findings were that there—all the important viscera had been removed; there was no more arteriosclerosis than you find in the usual body of a woman of forty, and we were brought then to the question of whether she had kidney disease or did not have kidney disease. With the viscera removed it is impossible to determine with an examination of tissue present what she actually died from. At the time the theory of whoever was there was that she may have had mercurial poisoning, was certain to take some time to determine, and possibly the form of kidney disease, whether we can differentiate kidney disease as produced artificially and kidney disease that comes as a gradual growth of disease. The reason for this seemed to be that a young heiress, engaged to an old man for three years, who finally married her; a tremendous fortune at stake, and she dies within two years after this marriage when shortly prior to the marriage she had been examined by two very good New York doctors who declared her absolutely free of kidney or heart disease; and the question arose: can you produce an artificial disease that simulates the usual disease, and what are the possible variances in this case particularly in the kidney disease? because we had nothing to do with whether there was or was not any foul play, but simply to ask an investigation again—investigate certain evidence. And we pointed out the fact that the usual

chronic interstitial nephritis, all of the cases we have had at the hospital have all had blood pressure, and we found,—in the course of 31 urine examinations, where they were some alkaline, some acid and some neutral,— we always had found casts. And the fact that the blood pressure was usually 150 and never up to 200, we pointed to that as variance from the usual case of nephritis. We realize, of course, that nephritis can vary tremendously, but we were merely asked from the medical point of view to point out where this might vary from the usual, and these were the findings that we presented. We find evidence to support that. There is a considerable library of evidence which shows that variance in the disease, kidney disease, can be produced artificially. The most recent work is that of Sansom where he says in rabbits he can produce chronic interstitial changes with rise in blood pressure, producing, over a long period of time, an excess of acid-residue substances. Q Doctor, did you examine the clinical records at Tripler General Hospital? A I did; I just gave a report of them. Q Was it upon that, the fact that those urinalyses—report of urinalyses, 31 altogether, over a period of ten months, where there were both acid and alkaline reactions, showed no casts, was that the basis for your statement? A Well, my statement was over a person where certain findings differed from the usual case of arteriosclerosis with chronic interstitial nephritis that kills a young person, appreciating that these findings are not evidence but merely variances, and that the clinical picture of a condition can't produce a nephritis, and a nephritis might be produced by many things; that the toxin of disease can produce a nephritis, and many substances can produce a nephritis; that wasn't at all the question, that this woman didn't have nephritis, it was just a question of variance, of possibilities of how this varies from the usual diseased condition as we see it."

It is apparent from the quoted portion of Dr. Larsen's testimony that he was not in entire accord with the view expressed by Doctors Straub and Fennell and that contained in the death certificate filed by Major Whitmore, relating to the cause of Mrs. Sevier's death. In fact, his testimony tends to support the hypothesis that the condition in which he found portions of Mrs. Sevier's body may have been caused by slow poisoning.

We turn now to a consideration of the further information submitted to the respondent with a view to determining whether under all the circumstances there is sufficient to generate in a reasonable mind the suspicion that the deceased came to her death by poison and that an inquest accompanied by another autopsy is necessary to ascertain such fact. If the question thus presented is answered in the affirmative the decree appealed from should be affirmed and the coroner authorized to proceed notwithstanding a deeply embedded respect for the dead and the tender feelings of friends and relatives. On the other hand, if the evidence leads us to a different conclusion, the coroner should be restrained.

Under date of October 9, 1929, Ralph L. Shainwald, Jr., addressed the following letter to the respondent:

"My sister, the wife of Colonel Granville Sevier, died at Tripler General Hospital, Fort Shafter, November 27th, 1928, under circumstances which convince me that she died of poisoning.

"Considerable study of the circumstances surrounding her death has already been made, and an autopsy was performed on April 15th of this year, but the information gained from said autopsy was limited by the reason of the fact that all of the principal internal organs had been removed and destroyed prior to the time said autopsy was held.

"I engaged Dr. Nils P. Larsen and Dr. Alexander O. Gettler as my representatives at said autopsy, and they are still studying the case.

"The body now lies in the receiving vault in Nuuanu Cemetery, which is under your jurisdiction, and I now ask you as coroner to take charge of this body so that it cannot be further tampered with, and hold it until our studies can be completed.

"I also ask that you arrange for an autopsy at which my medical adviser, Dr. Nils P. Larsen, can be present, for the purpose of securing additional information as to the cause of my sister's death.

"When all of the available information has been had, I would suggest that a coroner's jury be then impanelled to inquire into the cause of my sister's death."

Later in the same month the respondent received two letters from Dr. Nils P. Larsen, the first, dated October 21, 1929, reading as follows:

"Mr. Ralph Shainwald has asked me to write you, supplementing his request that you hold an inquest over the body of his sister, Marion Sevier, and take charge of the remains until our studies are completed.

"Since the vital organs had been removed, prior to the post-mortem examination, which I attended, the study is unusually difficult and prolonged.

"Various facts and circumstances in this case are highly suspicious, and point to the possibility of foul play; it would, therefore, seem that every possibility should be tried to clear or prove this suspicion."

The second, dated October 23, 1929, reading:

"Supplementing my recent letter, I would add that, at the requested autopsy of Marion Sevier, I plan to secure additional material for study.

"I would explain to Dr. Faus, at the time of the autopsy, just what specimens are wanted."

Under date of November 16, 1929, Mr. Shainwald wrote the following letter to the respondent:

"Our conversation of yesterday touched on the question: 'Is there any circumstance in the death of Marion Sevier which is really suspicious?'

"You already have letters from Dr. Larsen bringing out the suspicion, which is in his mind. These should be given the greatest weight, and consideration, as Dr.

Larsen has the reputation of being ultra conservative in his statements. He holds the position of medical director of Queen's Hospital, the leading hospital of the Hawaiian Islands; and he is recognized as the foremost pathologist, within a radius of many thousand miles.

"But in addition to the previous letters of Dr. Larsen, I hand you, attached hereto, a further letter stating that the ribs of Marion Sevier had never been cut through, or lifted out.

"This is in direct contradiction to the statement made by Joe Castro, in the presence of chief of police, David Hao, and others; that Castro was the man who removed the viscera from Marion Sevier, and that he cut through the ribs and lifted them out.

"This letter, therefore, presents the fact that in addition to the previous grounds for suspicion, there has been a clear misstatement of fact in some of the circumstances surrounding the death of Marion Sevier."

Attached to the foregoing letter was another letter from Dr. Larsen to the respondent, dated November 16, 1929, reading as follows:

"I was present April 15th, 1929, at the autopsy of Marion Sevier.

"The incision in the abdomen did not extend over the ribs, but stopped at the margin. The ribs had never been cut thru or lifted out."

The respondent then received the following two letters under date of November 18, 1929:

"Mr. Patrick J. Gleason, Coroner,
City and County of Honolulu,
Honolulu, T. H.
"Dear Sir:

"At the request of Mr. Ralph Shainwald, I am writing to give you some facts on embalming.

"I am a licensed embalmer, employed by H. H. Williams, 1374 Nuuanu Ave.

"It is not customary either here, or on the mainland, to remove the internal organs of bodies: ordinary embalming preserves the kidneys and heart just as easily as the hands and feet.

"When a body, without noticeable decomposition, is received by an undertaker, the removal of viscera would be an unnecessary mutilation, contrary to all teaching and civilized practice.

"If a body is received, in which organs have been cut loose at autopsy, it is customary to soak them for about 15 minutes, in formaldehyde solution, which is sufficient to preserve them for years. They are then invariably replaced in the cavities and sewn up.

"It is taught in undertaking schools that everything which belongs to a body, should be conscientiously replaced in that same body, unless autopsy specimens have been taken for study.

"Very truly yours,<br>"Eugene Schamber."

"Mr. Patrick J. Gleason,
Coroner, City and County of Honolulu,
Honolulu.
"Dear Sir:

"I have been requested by Mr. Ralph Shainwald to communicate with you in regard to the death of his sister, Mrs. Marion Sevier.

"I beg to inform you that no permit was ever issued by the bureau of vital statistics of this department for the disposition of the remains of Marion Sevier, except authority to place the remains in the receiving vault at the Oahu Cemetery.

"I have been informed that certain organs of the body of Marion Sevier have been removed and destroyed, and I therefore invite your attention to section 103 of the Sanitary Code, as amended September 28, 1927, reading as follows:

" 'No body of any dead person, whose death occurred in the Territory, shall be interred, deposited in a vault or tomb, cremated or embalmed, or otherwise disposed of in the Territory, or removed from or into any registration district thereof, or be held pending further disposition not more than 72 hours after death, unless a written burial or removal permit shall be given by the registrar or deputy registrar of births, deaths and marriages of the registration district in which the death occurred.'

"For your information, I wish to advise you that in

the conduct of autopsies at the morgue of the board of health, it is always the practice to place all internal organs that were removed for examination back in the abdominal or plural cavities before sewing up the post-mortem incision.

"Very truly yours,
"F. E. Trotter
"President and Executive Officer."

The above were followed by two further communications from Dr. Larsen to the respondent, the first, dated December 16, 1929, reading:

"I consider many facts connected with the death of Marion Sevier, suspicious.

"My studies, following the first autopsy, have produced facts, which are not in complete agreement with the clinical diagnosis.

"Although most of the vital organs have been removed, an analysis of the remaining organs and tissues may throw light on the cause of death."

The second, dated January 24, 1930, reading:

"I should like to clarify and amplify my position as shown in the stenographic record of our conference of Dec. 17th, last, which probably due to many technical terms used showed many clerical errors.

"There are many facts in the case of Marion Sevier, which vary from the usual course of nephritis of natural origin. The variations might be explained on the theory that the nephritis was brought on by the slow administration of poison. Some of the facts are very striking, and I believe a coroner's inquest should be held.

"Although the stomach and kidneys have been removed by someone, the uterus is still in the body. Recent studies suggest that the uterus is an organ which eliminates poison, in the case of lower animals, and it probably so acts in the case of human beings, but, in addition to the uterus, there are other parts, not yet removed, which might help clarify the case.

"The autopsy shows that generalized arterio-sclerosis was absent.

"The body was in excellent preservation, when I examined it, April 15, 1929, about eight months after

death. I believe that at this date, it might throw light on the cause of death, even if some decomposition has occurred.

"I have given this case a great deal of thought, and should like to be present at the inquest. I sail for the mainland on Feb. 5th, next, and trust you can complete arrangements before that time."

The final communication which we must consider was one received by the respondent from Major W. C. Whitmore, under date of January 18, 1930, as follows:

"I am writing at the request of Mr. Ralph Shainwald, whose sister, Marion Sevier, I treated during her last hospitalization, July 4, 1928, to her death Aug. 27, 1928.

"I was then chief of the medical service of Tripler General Hospital, Fort Shafter.

"Marion Sevier was suffering from chronic interstitial nephritis and enlarged heart.

"Her history showed an attack of scarlet fever as a young girl, and I was led to believe that her health had been failing gradually for many years, and that the chronic interstitial nephritis was a direct result of the early scarlet fever.

"My diagnosis was therefore based on those assumptions.

"A further study of the case elicits two facts, which prove conclusively that the early scarlet fever could not have been the cause of her chronic interstitial nephritis.

"First: Several competent physicians, who examined Marion Sevier, within an eight year period preceding her death, affirm definitely the absence of chronic interstitial nephritis and heart disease.

"Second: Microscopic study of tissues taken at autopsy, show clearly that she did not have generalized arteriosclerosis: which, in my opinion, she undoubtedly would have had, if the early scarlet fever had been the cause of her chronic interstitial nephritis.

"I was not in possession of the above facts until recently, and since they tend to throw a different light on the case, I believe that a coroner's inquest should be held to determine, as accurately as possible, the cause which induced, in a comparatively young woman, chronic

interstitial nephritis and a rapidly enlarging heart."

On February 15, 1930, Major Whitmore addressed a communication to the adjutant general, Washington, D. C., in which he expressly reiterated his belief that Mrs. Sevier had died of natural causes. He further stated that his only motive for signing the letter addressed to the respondent was to put an end quietly and quickly to an affair that was derogatory to the service in general and particularly to Colonel Sevier, and that he felt this would be accomplished by an inquest.

It appears from the respondent's own testimony that he was brought to the conclusion that an inquest should be held and another autopsy performed by the information conveyed in the letters of Shainwald, Dr. Larsen and Major Whitmore, above quoted, together with the circumstances attending the removal and disposition of the viscera.

Shainwald's letter is hardly more than a reiteration of his belief that his sister died under circumstances that convinced him that she had been poisoned. There is no recital of these "circumstances" and the only facts referred to are that the viscera had been removed prior to the time that the autopsy of April 15, 1929, was performed and that Doctors Larsen and Gettler, who represented him at the autopsy, were still studying the case. Dr. Larsen's letters are of greater factual importance and therefore more persuasive that another autopsy should be performed. For instance, in his letter of January 24, 1930, he specifically points out that his findings, based on the first autopsy, differ materially from previous diagnoses of Marion Sevier's condition in that he found a total absence of generalized arteriosclerosis. He further states that the variance from the usual course of nephritis present in Mrs. Sevier's case "might be explained on the theory that the nephritis was

brought on by the slow administration of poison." On the subject of possible results to be obtained by another autopsy he states his belief that even on that date additional light might be thrown on the cause of death. In this communication he refers to the significant function of the uterus to eliminate poisons as revealed by recent studies of lower animals, saying that the uterus is still in Mrs. Sevier's body. Major Whitmore's letter indicates that in his opinion another autopsy might shed additional light upon the cause of Mrs. Sevier's death. His reasons for his belief that another autopsy is advisable are two,— first, diagnoses made within eight years preceding Mrs. Sevier's death had definitely affirmed the absence of chronic interstitial nephritis and heart disease, and, second, the first autopsy revealed no generalized arteriosclerosis, a fact which in his opinion proves that an attack of scarlet fever occurring during Mrs. Sevier's childhood could not have been the cause of the nephritis. This letter is contradictory of the certificate of death filed by Major Whitmore in that in the latter he states that "arteriosclerosis generalized" was a contributory cause of death while in the former it is said that Mrs. Sevier did not die of "generalized arteriosclerosis." It is true that subsequent to his letter to the coroner, Major Whitmore in his communication to the adjutant general explains and perhaps modifies what he said in that letter to the coroner but he does not repudiate his belief that another autopsy should be performed or his reasons for that belief. In addition to the foregoing communications a number of conflicting statements had been made to the coroner relative to the removal and disposition of the viscera. It is by no means clear from the record how and why this was done and it is still a matter of dispute as to the manner in which the viscera were disposed of.

As abhorrent as is the thought that a dead body may

for a second time be exposed to the mutilation of an autopsy and that such an act may impose additional suffering upon others, we cannot say from the record that it will be done capriciously and without a reasonable belief that it is necessary to the ascertainment of the cause of her death.

The decree appealed from is affirmed.

*Marguerite K. Ashford* (*Thompson & Winn* on the briefs) for petitioner.

*A. N. Tavares*, Deputy Attorney General (*H. R. Hewitt*, Attorney General, with him on the brief), for respondent.

